Filed 9/15/23  P. v. Donohoe CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C096067 |
| Plaintiff and Respondent, | (Super. Ct. No. S20CRF0131) |
| v. | |
| SEAN DONOHOE, | |
| Defendant and Appellant. | |

A jury found defendant Sean Donohoe guilty of the first degree murder of Manpreet S. and found true firearm enhancements under Penal Code[1] section 12022.53, subdivisions (b) through (d).  The case turned on the issue of identity, i.e., whether defendant was the masked gunman shown in a video of the murder.

---

[1]      All undesignated section references are to the Penal Code.

1

On appeal, defendant raises two evidentiary error arguments and two ineffective assistance of counsel arguments. He further argues the cumulative effect of the foregoing errors deprived him of a fair trial. Finally, defendant requests that we remand the matter for a new sentencing hearing because the trial court misunderstood the scope of its discretion under section 12022.53, subdivision (h). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Manpreet was shot and killed on August 6, 2013, in the late evening while working at a gas station store. Although the police had video footage of the murder, the case went unsolved for several years.

The video footage of the murder showed a person walking into the gas station store and shooting Manpreet; the shooter had a black mask around his face and wore jeans and a black jacket.[2] The shooter did not take anything from the store. The shooter merely entered the store, fired the gun, and left. The police recovered a .45-caliber bullet casing from the scene of the murder and retrieved a bullet consistent with a bullet fired from a 1911-style .45-caliber semiautomatic handgun from Manpreet's body.

South Lake Tahoe Police Officer Rebecca Morris-Allen responded to the dispatch call; she was dispatched to the gas station around 10:55 p.m. She checked the area for witnesses and suspects, and precluded people from entering the perimeter around the store. Although it was clear the store was a crime scene due to the crime scene tape and police activity, Officer Morris-Allen encountered defendant and Jason R. walking up to the store approximately 15 minutes after she arrived; both defendant and Jason displayed "some of the signs and symptoms of somebody under the influence of some intoxicant of some sort." Defendant said he was heading to the store to purchase cigarettes. Officer Morris-Allen wrote down their names and where they lived.

---

[2] The jacket was alternately identified as a hoodie or sweatshirt during testimony. It could be either of the three clothing items; we use the term jacket for consistency.

On August 13, 2013, Roy G. flagged down South Lake Tahoe Police Detective Jake Herminghaus, who was then a patrol officer. Roy was excited and said "he had located a mask" and "he had s[een] a news article about a homicide and believed . . . the mask could have been involved." Detective Herminghaus called the detectives in charge of the case to collect the mask. The mask was black and yellow and was retrieved "a few streets south of the gas station."

El Dorado County District Attorney Investigator Joe Ramsey assisted the police department in investigating Manpreet's death and was later assigned as the cold case homicide investigator for the case.[3] As the cold case homicide investigator, Investigator Ramsey helped to put a video together regarding Manpreet's murder, which was posted on social media. The video generated a tip that Jason and defendant were involved in the murder. Investigator Ramsey learned that Jason and defendant had lived "three or four blocks down and a block over" from the gas station at the time of the murder—"a 59-second drive following all the rules of the road." Investigator Ramsey decided to collect DNA from defendant and Jason to compare against the DNA on the mask obtained from Roy.

The DNA testing consisted of swabs taken from the black and yellow sides of the mask. Each sample revealed a mixture of DNA; each sample had a primary contributor (i.e., a person contributing more DNA) and low-level contributors. The sample taken from the yellow side of the mask provided strong evidence that defendant was the primary source of the DNA profile on the mask. The sample further provided strong support that defendant, Roy, and one unknown individual were contributors to the DNA mixture; however, Roy and Jason could not be DNA contributors together if defendant was a contributor.

---

[3] The term "cold case" refers to a case that has "gone unsolved for an extended period of time."

The sample taken from the black side of the mask showed at least three DNA contributors. Roy's DNA and defendant's DNA were strong matches as contributors to the mixture. "The mixture proportion assigned" to defendant was 83 percent and the two contributors were assigned 14 percent and 3 percent respectively. Because there was very strong support that Roy and defendant were contributors to the mixture, the DNA forensic analyst concluded the mixture "cannot be of [defendant], Roy . . . , and Jason . . . together." In other words, given that defendant and Roy "are two of the three contributors," Jason "cannot be the third contributor."

During Investigator Ramsey's testimony at trial, the prosecution introduced and played several videos for the jury. The first video showed defendant parking his car at the gas station on August 6, 2013, at 6:10 p.m., and him entering and leaving the store. The second video showed Jason getting out of defendant's car on the passenger side and entering the gas station store later that evening at 10:24 p.m., approximately 16 minutes before the murder. Jason purchased something, walked back to defendant's car, and got into the passenger seat. The third video showed a car similar to defendant's car driving on the street behind the gas station at 10:37 p.m. Approximately three minutes later, a person wearing a black jacket and black mask with a mark in the vicinity of the left cheek walked up to the gas station store from the street behind the store. The person entered the store with a gun in his right hand but then switched the gun to his left hand before pulling the trigger and shooting Manpreet. The person left the store with the gun in his left hand and walked back toward the street behind the gas station where the car that was similar to defendant's car was seen driving a few minutes before. Investigator Ramsey testified the mask obtained from Roy had a mark in the vicinity of the left cheek like the mask worn by the shooter.

The fourth and fifth videos that were played for the jury during Investigator Ramsey's testimony compared video footage of the shooter walking up to the store against video footage of both Jason and defendant walking in the store's parking lot.

4

Investigator Ramsey testified that in his opinion, the way the shooter walked in the video was the same as the way defendant walked, but not the same as the way Jason walked. Investigator Ramsey explained he had watched the videos "many, many, many times" and had seen both defendant and Jason in person several times. Investigator Ramsey also testified that he believed Jason was right handed whereas defendant was left handed. Detective Herminghaus's testimony echoed Investigator Ramsey's testimony.

Detective Herminghaus testified he had met Jason and defendant in person, Jason is taller than defendant, and, after watching videos of Jason and defendant multiple times," he observed "[t]hey have a different gait" in that defendant "kind of walks rearward more or leans back a little more when he walks" and "Jason stands more upright." Detective Herminghaus testified he believed that, based on his review of the video of the homicide "[p]robably more than 50 times," the way defendant walks is similar to the way the shooter walked in the video. He further testified that, based on his personal observations of defendant and Jason, he believed defendant was left handed and Jason was right handed.

Federal Bureau of Investigation photographic technologist Anthony Imel, who was accepted as an expert in height determination, testified defendant's chin placement was consistent with the shooter's chin placement whereas Jason's chin placement was not.

Jason testified at trial; the following summarizes his testimony. At the time of the murder, defendant and Jason lived together and drank a lot of alcohol. They bought most of their alcohol at the gas station store because it was within walking distance from where they lived. On the evening of Manpreet's murder, Jason and defendant went to the gas station to buy more alcohol. Defendant drove them to the store and Jason went inside. Manpreet declined to sell alcohol to Jason because Manpreet believed Jason was intoxicated. Jason bought cigarettes instead and he and defendant went back home. Jason assumed he told defendant that Manpreet did not sell alcohol to him again, explaining "it was pretty common that this happened, so it wasn't the first time." Jason

5

was not sure that he relayed that information, however. Defendant did not seem "particularly" angry that evening.

When Jason and defendant got home, they went inside and defendant "said he would be back." Defendant "was gone for a couple minutes, or ten minutes or so," and when he returned, he "[d]efinitely seemed a little more on edge and made a comment, something about like 'I did it,' or 'It happened,' or something like that, along those lines, something really brief and . . . just kind of nonchalant." Defendant explained "he had shot the gas station clerk" "and he went to the river and threw . . . the gloves that he had on in the river, the gloves and the mask." Jason did not believe defendant's story and decided to walk to the gas station; defendant joined him. The area was taped off with yellow tape and "a bunch of sheriffs and California Highway Patrol" were there. An officer briefly stopped them and asked what they were doing there; they responded that they were looking for defendant's dog and she asked for their names and phone numbers.

Jason and defendant "went straight back home" and Jason called his parents "that evening or the following evening" "and told them, because [he] was just freaking out." Defendant told Jason he used a ".45[-]caliber 1911 pistol" to kill Manpreet; Jason believed the gun was defendant's gun because he had seen the gun in defendant's possession prior to that day.

Within a week of the murder, defendant told Jason that "he was already potentially looking at murder and life in prison, [and] it wouldn't be anything . . . to kill one more person." Jason moved out of California approximately two weeks after the murder because he was scared of "[e]ither being killed [by defendant] or . . . police showing up and thinking [he] was involved." Jason's father testified Jason told him in 2013 that defendant had shot and killed someone. Jason's father did not report the information to the police because he did not believe it was true.

Jason testified he at some point told his former fiancé, to whom he was then engaged, that he was the one who killed Manpreet. He explained he made that

6

confession to her because she was studying to be a detective and had "looked at a bunch of cold case videos and actually had brought it up." Jason was concerned that if defendant found out the police had been contacted, "something might happen to [his] family" given "there had been prior threats about that, and [his] brother had just had a kid." The parties entered a stipulation that if Steven T. were called to testify, Steven would have testified that Jason told him on three separate occasions that he killed Manpreet.

Jason confirmed he is right handed and testified he believed defendant was left handed. Jason's father, who knows defendant, also testified that defendant was left handed, as did Caitlyn O. who was romantically involved with defendant in high school and for a while thereafter.

During Caitlyn's testimony, she testified she called the South Lake Tahoe Police Department in 2020 after seeing a video of the murder on the cold case website. She explained she made the call because someone "had sent [her] a video, and they had included something about it possibly being [defendant], and [she] watched it several times, and [she] called just trying to help in any way possible if [she] could." She explained the person who sent the video said defendant had been arrested "or something like that" and she was thus looking at the video "as like maybe that's him" because she "want[ed] to help in any way possible, like if it was or was not." She testified she watched the video 10 to 15 times because she "was just trying to figure out if anything resembled [defendant], but [she] hadn't seen him in so long that it was kind of tricky for [her]." When asked what she told Investigator Ramsey after watching the video, she responded, "Just similar clothing and just stature and just the way he walked, I guess."

The jury found defendant guilty of first degree murder and found true the firearm enhancements under section 12022.53, subdivisions (b) through (d). The trial court sentenced defendant to 25 years to life for the murder conviction and a consecutive 25

7

years to life for the firearm enhancement found true under section 12022.53, subdivision (d). Defendant appeals.

DISCUSSION

I

*Evidentiary Error Claims*

Defendant asserts the trial court prejudicially erred by: (1) allowing Investigator Ramsey and Detective Herminghaus to identify him as the shooter by comparing video footage; and (2) admitting Roy's hearsay statements through Detective Herminghaus's testimony regarding the mask. We disagree.

A

*The Trial Court Did Not Err In Allowing The Officers To Testify*

*Regarding Their Lay Opinions Pertaining To The Video Footage*

Defendant argues the trial court prejudicially erred by allowing Detective Herminghaus and Investigator Ramsey "to identify [defendant] as the culprit by comparing video footage" (capitalization & boldface omitted) because their lay opinion testimony "was neither helpful to understanding their testimony nor based on personal knowledge."

The People retort that, "with the exception of one instance that [defendant] does not mention, neither [of the officers] identified the masked [shooter] in the video of [Manpreet's] murder as [defendant]." (Boldface & capitalization omitted.) As to the singular reference defendant does not mention, the People assert defendant did not object to the testimony and thus forfeited the issue. Finally, the People argue, to the extent defendant asserts the trial court erred in allowing the officers to testify regarding his height, gait, and left-hand dominance, his claim fails because their identifications of defendant "in the various surveillance videos and photographs were based on their personal observations and interactions with [defendant] and [Jason]."

8

We conclude the trial court did not abuse its discretion in allowing Investigator Ramsey and Detective Herminghaus to testify as to their lay opinions regarding the video footage. "A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) '[T]he identity of a person is a proper subject of nonexpert opinion.' " (*People v. Leon* (2015) 61 Cal.4th 569, 601.) "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Ibid*.) We review the admission of the evidence for abuse of discretion. (*Id.* at p. 600.) We accordingly do not disturb the trial court's exercise of discretion on appeal unless it was exercised in "an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) Defendant has made no such showing here.

Defendant filed a motion in limine seeking to exclude prosecution witnesses from purporting to identify him in the surveillance video of the murder. Defendant argued the implication that he was the shooter in the video was not based on admissible evidence because "[t]he officers established no personal knowledge of how [he] moved or how dissimilar his movements are compared to the [shooter in the] video." The trial court preliminarily indicated the testimony would be admitted because defendant's argument went to the weight of the evidence rather than its admissibility. The court explained: "[O]ne of the issues that the jury's going to have to ferret out in terms of the facts [is] . . . did they get the wrong guy? Why did they focus in on [defendant]? What was it about this video or anything else that caused them to conclude that he was the person that should be arrested and charged with this crime?" The trial court noted it did, however, "want to think about" whether the testimony could possibly give Caitlyn's testimony greater credibility and how the testimony could be given "without giving the appearance of vouching for [Caitlyn's] testimony."

9

During trial, Investigator Ramsey testified he and other investigators used photographs of Jason and defendant to identify video clips from the gas station's security cameras for review. Jason and defendant "frequented the store quite often." Investigator Ramsey explained he was familiar with both Jason and defendant, having "met them both in person" several times and having "star[ed] at their pictures since 2019." He further testified he watched videos of defendant walking in the gas station parking lot and the video of the shooter "many, many, many times." He explained he could tell the difference between Jason and defendant and "c[ould] identify them through the video."

During Investigator Ramsey's testimony, he testified gait (i.e., the way someone walks) became significant to him because it helped to distinguish between Jason and defendant. In addition, Investigator Ramsey noted Jason appeared to be right-hand dominant, whereas defendant appeared to be left-hand dominant. Defendant objected to this testimony as an improper opinion. The trial court responded, "Well, I . . . think he's opining as to observations that he made that caused him to focus in on one person over the other, and I think that's within the bounds of the [c]ourt's ruling, and it's subject to cross-examination, so overruled." When defendant later objected based on improper opinion as to Investigator Ramsey's identification of Jason in a video, the trial court responded: "And, once again, from the [c]ourt's perspective, the -- first of all, there's no expert identifying someone's gait . . . Investigator Ramsey is talking about things that he took note of that led him in certain directions as it relates to his investigation, and that's the purpose for which that evidence is offered, and beyond that, it's not admitted as an expert opinion in any way, shape, or form."

As noted *ante*, Detective Herminghaus's testimony echoed Investigator Ramsey's testimony. Detective Herminghaus testified he had met Jason and defendant in person, Jason is taller than defendant, and, after watching videos of Jason and defendant multiple times, he observed "[t]hey have a different gait" in that defendant "kind of walks rearward more or leans back a little more when he walks" and "Jason stands more

10

upright." Detective Herminghaus testified he believed that, based on his review of the video of the homicide "[p]robably more than 50 times," the way defendant walks is similar to the way the shooter walked in the video. He further testified that, based on his observations of defendant and Jason, he believed defendant was left handed and Jason was right handed.

*Leon* is instructive. In *Leon*, a detective identified the defendant in surveillance videos. (*People v. Leon*, *supra*, 61 Cal.4th at p. 600.) The detective was familiar with the defendant based on the detective's postarrest contacts with the defendant. (*Id*. at pp. 600-601.) That is, the detective was present during the defendant's arrest, saw him nearly 10 times thereafter, and spent about two hours with him. (*Id*. at p. 600.) Moreover, the jacket the defendant was wearing when he was arrested appeared to be the same jacket worn by the suspect in the surveillance videos, and the car in the videos looked like the car the defendant was in when he was arrested. (*Id*. at pp. 600-601.) Our Supreme Court concluded this identification was properly admitted. (*Id*. at p. 601.) In concluding the trial court did not abuse its discretion in allowing the officer's identification testimony, *Leon* also noted, "[B]ecause the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was [the] defendant." (*Ibid*.)

Here, as in *Leon*, there was evidence that Investigator Ramsey and Detective Herminghaus were able to identify similarities between defendant and the shooter based on their personal knowledge. Both Investigator Ramsey and Detective Herminghaus had met defendant in person and testified they had watched videos of defendant walking many times and had compared his way of walking against the shooter's way of walking in the video. Their testimony was further helpful in explaining why Detective Herminghaus and Investigator Ramsey believed the masked shooter was defendant rather than Jason, even though Jason had confessed to his former fiancé and another person that he had murdered Manpreet. The shooter wore a mask, and thus identification based on

11

facial features was impossible.  The officers' testimony was based on height, gait, and hand use dominance.  Although the jurors were able to observe defendant in the courtroom, defendant was predominantly seated, and the jurors might not have been able to study his movements, height, or hand use dominance to the same extent the officers were able to before trial.  Under these circumstances, we cannot conclude the trial court abused its discretion.  Any "[q]uestions about the extent of [the officers'] familiarity with defendant's appearance went to the weight, not the admissibility, of [their] testimony." (*People v. Leon*, *supra*, 61 Cal.4th at p. 601.)

Further, here, as in *Leon*, the jury could make up its own mind whether the shooter shown in the video was defendant and how much weight to give the officers' testimony. We reject defendant's argument that the officers' testimony was inadmissible because it amounted to an opinion that defendant was guilty, thus infringing on the jury's role as the exclusive finder of fact.  As *Leon* makes clear, the officers were allowed to offer lay opinion testimony that defendant was the shooter shown in the video.

For these reasons, we find no prejudicial error in admitting the officers' testimony pertaining to the similarities between the shooter and defendant in video footage.

B

*The Trial Court Did Not Abuse Its Discretion In Admitting*

*Detective Herminghaus's Testimony Regarding Roy's Statements*

Roy passed away prior to trial.  At trial, Detective Herminghaus testified Roy made two statements to him, i.e., "he had located a mask" and "he had s[een] a news article about a homicide and believed . . . the mask could have been involved."  The trial court had previously ruled that Detective Herminghaus's testimony in that regard would be admitted because Roy's statements qualified as excited utterances, an exception to the hearsay rule.

Defendant argues the trial court prejudicially erred in admitting Roy's hearsay statements because "the statements were given in the context of a police investigation and

12

finding the mask was not shown to be a recent or stressful event." He further argues the testimony as to Roy's statements violated the confrontation clause of the federal Constitution.

The People disagree, arguing: (1) Roy's statement that he saw a news article about the murder and believed the mask could be involved was not hearsay because the statement explained why he flagged the police officer down and the statement was not offered for the truth of the matter asserted; (2) even if the statement was hearsay, that statement and the statement that Roy had located a mask were properly admitted as spontaneous statements; (3) the statements did not violate defendant's Sixth Amendment right because they were not testimonial in nature; and (4) even if the trial court erred in admitting the statements, defendant suffered no prejudice requiring reversal.

We do not address whether Roy's statements were properly admitted because, even if the statements constituted hearsay and were testimonial in nature for purposes of the confrontation clause as defendant asserts, the error did not prejudice defendant. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [error in admission of hearsay requires reversal only if there is a reasonable probability of a result more favorable to the defendant in the absence of the error]; *People v. Harrison* (2005) 35 Cal.4th 208, 239 [confrontation clause error requires reversal unless it is found beyond a reasonable doubt the verdict would have been the same absent the error].)

There can be no prejudice from the admission of Roy's statement that he "had located a mask" because, even if that statement were excluded at trial, the jury still heard testimony that Detective Herminghaus was flagged down by a citizen who showed him a black and yellow mask, he called detectives to collect the mask, and the mask was retrieved "a few streets south of the gas station." Roy's identity as the person who found the mask was immaterial to the outcome of the case and Detective Herminghaus's testimony established that the mask was found and handed over to the police.

13

Roy's statement that he believed the mask "could have been involved" in the murder also did not prejudice defendant. Defendant argues he was prejudiced because the prosecutor argued Roy's belief that the mask might be related to the murder tied defendant to the crime and without the admission of Roy's statements "nothing linked the mask to the crime; it merely looked similar to one worn by the shooter in the surveillance video." The problem with this assertion of prejudice is that Roy's statement did not tie the mask to the crime, nor did the prosecutor argue that it did. Roy's statement merely explained why he flagged a police officer down to turn the mask over; nothing in Roy's statement indicated he had any personal knowledge that the mask was *in fact* involved in the crime, and thus we fail to see how Roy's asserted reason for turning the mask over to the police prejudiced defendant.

The prosecutor's closing argument also did not imply that Roy's statement linked the mask to the crime. The prosecutor argued: "We also know that Roy . . . turned over a mask just I think it was a block-and-a-half or two blocks away from the crime scene after watching -- after watching the TV basically, and he says, oh, I saw this on the news, and handed over a mask. This might be relevant to that guy getting murdered. [¶] I mean, he was just being a good citizen turning it over, and thank God he did, because without it, we wouldn't have had the DNA that definitively ties [defendant] to being the killer."

Assuming Roy's statements were excluded, the jury still saw the video of the shooter wearing a mask and heard testimony that the shooter wore a black mask with a mark in the vicinity of the left cheek, a citizen flagged Detective Herminghaus down and showed him a black and yellow mask, the mask had a mark in the vicinity of the left cheek like the mask worn by the shooter, the mask was retrieved "a few streets south of the gas station" after the murder, defendant told Jason that he had gotten rid of the mask he wore on the night of the murder, and defendant's DNA was on the mask that was retrieved. Based on the foregoing evidence, we fail to see how the inclusion of Roy's

14

speculation that the mask "could have been" connected to the murder prejudiced defendant.

Defendant argues in his reply brief, "Where the mask was turned over is irrelevant; the important fact is where the mask was *found*." In defendant's view, there was no testimony providing "that important link" *absent* Roy's statements. That is, he asserts Roy's "hearsay statement that he found a mask that, after seeing the news about the homicide, he believed might be involved created the missing link between the mask and the crime." But Detective Herminghaus did not testify that Roy told him where he *found* the mask; Roy merely told him that "he had located a mask." Defendant's argument thus has no merit.

Detective Herminghaus also did not testify that Roy said he retrieved the mask "a few streets south of the gas station," as defendant implies in his opening brief. Detective Herminghaus's testimony in that regard was responsive to the prosecutor asking where *Detective Herminghaus* retrieved the mask "in correlation to where [the gas station] is." While the jury could possibly have inferred from Roy's statements that Roy located the mask at or near his home a few blocks from the gas station, the same would have been true even if Roy's statements had not been admitted. That is because Detective Herminghaus testified *he* retrieved the mask "a few streets south of the gas station."

For the foregoing reasons we conclude defendant has failed to establish prejudicial error requiring reversal.

## II

### *Ineffective Assistance of Counsel Claims*

Defendant raises two ineffective assistance of counsel claims. The first pertains to his trial counsel's failure to request cautionary instructions; the second pertains to his trial counsel's failure to object to a portion of Caitlyn's testimony. " 'To show ineffective assistance of counsel, [the] defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing

15

professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.' [Citation.] ' "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' [Citation.]

"We presume counsel's conduct fell within the 'wide range of reasonable professional assistance.' [Citation.] Our review is limited to the record on appeal and we must reject a claim of ineffective assistance 'if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation.' " (*People v. Bonilla* (2018) 29 Cal.App.5th 649, 653-654.) Defendant has failed to carry his burden in demonstrating ineffective assistance of counsel.

A

*Defendant's Trial Counsel Was Not Ineffective*

*For Failing To Request Cautionary Instructions*

Defendant asserts his trial counsel was ineffective in failing to request two cautionary instructions related to Jason's testimony—an instruction regarding accomplice testimony and an instruction to view defendant's out-of-court statements with caution. We disagree.

As to the accomplice instruction argument, defendant asserts the instruction was appropriate because Jason "could have been a principal in the offense as an aider and abettor" and "could have conspired to commit the offense, encouraged the offense, or aided the offense as the driver." In that regard, defendant asserts Jason is "a possible contributor to the DNA on the mask"; there were photos in which both he and defendant were "wearing a similar mask"; Jason "was at the scene minutes before the homicide, and . . . [Manpreet] refused to sell him alcohol"; and Jason "confessed to the killing multiples [*sic*] times to multiple people." The problem with defendant's argument is that he

16

presents no reasoned argument as to how the foregoing constitutes substantial evidence that Jason was an accomplice in the murder.

"Section 1111 defines an accomplice as 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' In order to be chargeable with the identical offense, the witness must be considered a principal under section 31. That statute defines principals to include '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . .' [Citations.] A mere accessory, however, is not liable to prosecution for the identical offense, and therefore is not an accomplice." (*People v. Horton* (1995) 11 Cal.4th 1068, 1113-1114.) An accomplice is someone who acted " ' "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." ' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

Here, there was no evidence from which the jury could find that Jason was an accomplice to the crime charged, and thus defense counsel was not ineffective for failing to request an accomplice instruction. There was no evidence Jason knew of defendant's criminal purpose or that Jason acted with the intent to commit the murder or to encourage or facilitate the murder. Indeed, Jason testified defendant did not seem upset when Manpreet refused to sell alcohol to Jason and defendant left soon after they got home from the gas station store, without indicating where he was going or what he was going to

17

do. There was *no* evidence in the record that Jason knew defendant was heading to the gas station store or that he intended to kill Manpreet.

Moreover, it is clear defendant's trial counsel's strategy was to point the finger at Jason as the *actual killer* and it would have been contradictory to assert that he was an accomplice to the murder. During closing argument, defense counsel repeatedly guided the jury to Jason's confessions that he murdered Manpreet, asserted Jason had access to the guns in the house and could fire a gun with his left hand, and posited Jason was the one with a motive to kill Manpreet because he was the one who was denied alcohol. Defense counsel further argued Jason "self-admitted that when he's drunk, he walks on the backs of his heels . . . . If that's so and the position of the [prosecution] is that the killer walks on the back of their heels, then the only person that admits to drinking that day and admits that they walk on the back of their heels when they're drunk is [Jason]."

Given there was a satisfactory explanation for defendant's trial counsel not to request the accomplice instruction, defendant has failed to carry his burden of proving his counsel was ineffective.

We also conclude there is no basis for finding defendant's trial counsel was ineffective for failing to request that the jury be instructed with CALCRIM No. 358, which provides: "You have heard evidence that the defendant made [an] [oral] [and] [a] [written] statement[s] (before the trial/while the court was not in session). You must decide whether the defendant made any (such/of these) statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

In *Diaz*, our Supreme Court held that absent a request by the defendant, the trial court is not required to instruct with CALCRIM No. 358 (or its equivalent) because "it is

18

appropriate to allow the defendant to make the strategic decision whether to request the instruction." (*People v. Diaz* (2015) 60 Cal.4th 1176, 1193; *id*. at p. 1189.)  While *Diaz* did not involve a determination of whether counsel was ineffective in failing to request the cautionary instruction, our Supreme Court's recognition that defense counsel's decision to request a cautionary instruction is a strategic decision necessarily informs our conclusion that we cannot find ineffective assistance of counsel on appeal where there is a conceivable strategic reason for counsel's challenged decision.  Here, the strategic reason appears in the record.  Defense counsel's strategy was to have the jury find Jason to be the actual killer and that he was lying about what happened the night of the murder, including the statements defendant had made to him about the murder.  As the People assert, requesting that the jury be instructed with CALCRIM No. 358 "would have been superfluous to this theory."

In addition, defendant has not demonstrated prejudice to support his ineffective assistance of counsel claim.  Even before *Diaz* changed the law by discarding the trial court's duty to sua sponte give a cautionary instruction regarding out-of-court statements, its erroneous omission had "frequently been held to be harmless error in light of such general instructions on witness credibility," e.g., CALCRIM No. 226.  (*People v. Diaz*, *supra*, 60 Cal.4th at p. 1191; *id*. at pp. 1189, 1196-1197.)  Here, the jury was instructed with CALCRIM No. 226, which extensively covered the jury's role in evaluating a witness's testimony, including a variety of factors bearing on the truth or accuracy of that testimony.  Those factors included a witness's bias, interest, or other motive; prior consistent or inconsistent statements; and admissions of untruthfulness.  In addition, the trial court instructed the jury with CALCRIM No. 301, which provides:  "The testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."  The jury was further instructed with CALCRIM No. 302:  "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe."  Moreover, the jury was instructed

with CALCRIM No. 318 that it could use prior statements "to evaluate whether the witness'[s] testimony in court is believable."

When a jury is thoroughly instructed on the numerous factors involved in assessing witness credibility, failure to give the cautionary instruction in CALCRIM No. 358 is harmless because the jury has been adequately warned to view a witness's testimony with caution. (*People v. Diaz*, *supra*, 60 Cal.4th at p. 1196.) "Under these circumstances, it is not reasonably likely or possible that the error in omitting a cautionary instruction affected the outcome at the guilt or penalty phases." (*People v. Johnson* (2018) 6 Cal.5th 541, 588-589.)

For these reasons, we find that defendant's trial counsel was not ineffective for failing to request cautionary instructions.

B

*Defendant's Trial Counsel Was Not Ineffective For Failing To Object*
*To Caitlyn's Testimony Regarding The Stairs Incident*

Defendant argues his counsel was ineffective for failing to object to Caitlyn's testimony that defendant once pushed her down a flight of stairs. In his opening brief, defendant appears to assert the testimony was inadmissible under Evidence Code section 1101, subdivision (b) because identity and common plan were the only potential issues in the case and Caitlyn's testimony "could not provide a motive to shoot" Manpreet. He believes the evidence was subject to exclusion under Evidence Code section 352 as well because the incident was remote in time to the murder and the testimony was inflammatory.

The People respond the evidence was admissible under Evidence Code section 1102, subdivision (b) because the testimony was elicited to rebut defendant's evidence of his character for nonviolence. Thus, the People argue, defendant's trial counsel was not ineffective for failing to make a futile objection to the testimony and defendant cannot show he was prejudiced by his counsel's allegedly deficient performance.

20

In his reply brief, defendant argues Caitlyn's testimony "did not constitute proper rebuttal" testimony under Evidence Code section 1102, subdivision (b) because "[e]vidence of specific instances of conduct is inadmissible to rebut good character evidence except in cross-examination of a reputation witness."

We conclude defendant has failed to demonstrate his trial counsel was ineffective for failing to object to Caitlyn's testimony regarding the staircase incident because, even if an objection was appropriate (an issue we need not address), we can discern a tactical purpose for declining to object.

During Jason's testimony, defense counsel asked questions pertaining to defendant's good character. When the prosecution objected to that line of questioning, defense counsel explained: "So my client's been accused of murder, and it's disparaging. It's an attack on his character. I think I'm allowed to talk about the propensities one way or the other on the opposite side, and I think [Evidence Code sections] 1101, 1102, [and] 1103 will speak to that as well." Jason testified that when he worked under defendant's supervision at a restaurant, he found defendant to be helpful. Defendant's trial counsel asked whether he ever knew defendant "to get in a physical altercation with anybody" and Jason responded in the negative; he testified he never saw defendant get physical or violent with anyone other than him. Defendant's trial counsel further asked whether, from Jason's perspective, defendant "would actually try to de-escalate situations," to which Jason responded: "Yes, sir. I would say that definitely. I would say I was actually more the -- and I'm not violent myself either, but if I had to judge, I would say I was more violent than he was."

Outside the presence of the jury, the prosecution argued that, "based upon what [defense counsel] said at the bench, as well as the questions that he's asked, including he's not a physical person, tried to deescalate situations, more -- Jason was more violent tha[n] he was, would give up his time, basically he was a good person, there was a series of questions specifically about the [d]efendant's good character. At that point, I believe

21

that by asking those types of questions the [d]efense has put at issue the [d]efendant's character, and we should be entitled to rebut that. [¶] And there are a combination of things that we would like to go into as a result. For instance, the [d]efendant pushing his girlfriend at the time -- his ex-girlfriend down some stairs where she was injured, and as well as that, in addition to that, there was a pretrial motion that we sought to introduce evidence of, and I'm going to call it for this purpose a shrine to serial killers, and the [c]ourt specifically excluded that with the understanding that should it become an issue or [d]efendant testify, that we could revisit that issue."

Defense counsel responded: "So the questions that were asked were derived from the grand jury transcript and were actual testimony from this witness, [Jason], so that's where the -- the genesis of the questions came from. [¶] To the extent that they're allowed to rebut because my client's character has come out through their substantive material primary witness, I'll leave that for Your Honor to decide." Defense counsel did, however, disagree that "the serial killer commentary" was appropriate.

During Caitlyn's testimony, the prosecution asked her whether defendant was ever violent toward her during their relationship. She testified that when they were teenagers, they were at a party drinking alcohol and she followed defendant up a staircase telling him not to drive; defendant turned around and shoved Caitlyn, resulting in her falling down the stairs. Caitlyn did not suffer a significant injury and did not report the incident to the police. During cross-examination, defendant's trial counsel asked Caitlyn whether there were any other incidents that caused her concern or made her fear being around defendant; she responded in the negative. Defendant's trial counsel further asked her, "Fair to say when you knew [defendant] that he was caring and a good human?" Caitlyn responded, "Yes."

As the People note, the jury was instructed with CALCRIM No. 350, which provides: "You have heard character testimony that the [d]efendant is a nonviolent person. Evidence of the [d]efendant's character for being nonviolent can by itself create

22

a reasonable doubt whether the [d]efendant committed the crime charged . . . and the enhancements. However, evidence of the [d]efendant's good character may be countered by evidence of his bad character for the same trait. You must decide the meaning and importance of the character evidence. [¶] You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved [that] the [d]efendant [is] guilty beyond . . . a reasonable doubt."

During closing arguments, defendant's trial counsel argued Jason testified defendant was a "deescalater" and Caitlyn "had generally nothing but kind things to say. There was an incident when they were 15. Sounds like in a moment of anger [defendant] turned and pushed [her], which led to her falling down the stairs and taking a tumble and hurting herself. [¶] Other than that, the character that's reported about [defendant] doesn't comport with the reactive, angry killer, someone who's going to go back, get a gun, and start shooting people. [¶] There's a jury instruction that says you have heard character testimony that the [d]efendant is a nonviolent person. Evidence of the [d]efendant's character for being nonviolent can by itself create a reasonable doubt whether the [d]efendant committed the crime charged . . . and the enhancement. [¶] Forget about the mask not being the mask. Forget about the credibility of Jason . . . . You have character evidence if believed, as presented by [several witnesses including Caitlyn], that if you believe that propensity for nonviolence, that creates reasonable doubt. Just that."

Even if Caitlyn's testimony was inadmissible, " '[w]hether to object to inadmissible evidence is a tactical decision.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.) In that vein, "because trial counsel's tactical decisions are accorded substantial deference . . . , failure to object seldom establishes counsel's incompetence.' " (*Ibid.*) " 'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' " (*Ibid.*)

23

The record reflects counsel made a tactical decision to cross-examine Caitlyn on the subject of defendant's nonviolent character rather than objecting to her brief direct testimony regarding the single staircase incident that occurred when defendant was a teenager. Defendant's trial counsel reiterated Caitlyn's testimony in that regard during his closing argument—cumulatively discussing her testimony with other witnesses' testimony regarding defendant's nonviolent character—to argue the jury could find defendant's propensity for nonviolence created reasonable doubt. Questioning the wisdom of that decision with the benefit of hindsight cannot establish ineffective assistance, nor can the fact that another attorney may well have decided to object to the evidence. "No single right way exists to try a case." (*People v. Riel*, *supra*, 22 Cal.4th at p. 1177.)

III

*Defendant Suffered No Cumulative Prejudicial Error*

Defendant argues the cumulative prejudicial effect of the alleged errors requires reversal because it "create[d] a state of overall unfairness." Having rejected defendant's claims of error, we discern no prejudice—singly or cumulatively—that warrants reversal. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 832.)

IV

*We Decline To Remand The Matter For A New Sentencing Hearing*

Section 12022.53, subdivision (h) provides, in pertinent part, "The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." In *Tirado*, our Supreme Court held the foregoing provision includes the discretion to impose an uncharged lesser included firearm enhancement. (*People v. Tirado* (2022) 12 Cal.5th 688, 700.) Defendant argues the trial court was unaware of its discretion to strike or dismiss the section 12022.53, subdivision (d) enhancement or to impose a lesser enhancement at the time of sentencing and thus his claim of error was preserved despite

24

his counsel's failure to correct the trial court's misunderstanding, citing *People v. Fuhrman* (1997) 16 Cal.4th 930, 945-946. He requests that his case be remanded for the trial court to exercise its discretion. In the event his claim is deemed forfeited, defendant argues his trial counsel was ineffective for failing to correct the trial court's misunderstanding.

The People argue defendant's argument is forfeited because his trial counsel failed to object, and "the record does not affirmatively demonstrate . . . the [trial] court failed to understand it had the discretion to strike or dismiss the enhancement." The People further argue remand "would be an idle act because it is clear from the record the court would not strike or dismiss the enhancement."

We decline to remand the case for a new sentencing hearing. It is clear from the record that the trial court would not have exercised its discretion under section 12022.53, subdivision (h).

At the sentencing hearing, the trial court discussed the two-fold tragedy involving the case. First, that Manpreet had immigrated to the United States to make a better life for himself and to provide for his family, and he and his parents were deprived of the benefits of what his new life might have held. Second, that defendant "had taken some significant steps to turn things around in his life" after being "in an extraordinarily dark place in his life when" the murder occurred.

The trial court imposed a sentence of 25 years to life for the murder conviction and a consecutive 25 years to life for the firearm enhancement found true under section 12022.53, subdivision (d), i.e., defendant discharged a firearm in committing the offense and caused great bodily injury or death.[4] The trial court prefaced the imposition of the sentence, as follows: "The [c]ourt's jurisdiction in terms of discretion is very limited in

---

[4] The jury also found true the lesser included firearm enhancements in section 12022.53, subdivisions (b) and (c).

25

this case. The [c]ourt, even if it had the discretion to give a lower sentence, would not do so. [¶] In other words, if there were a change in the law that would allow the [c]ourt to strike the enhancement or something of that nature, I think, just because of the cold and calculated manner in which the crime occurred, it would not be an appropriate case to do so. [¶] And I'm doing that mainly from the perspective of if there is some subsequent change down the road in the law, it's clear that it would have been the [c]ourt's intent to . . . impose the time required for both the crime as well as for the enhancement." After the sentence was read, defendant did not object or argue anything further.

We need not resolve the parties' dispute as to whether the trial court's statements indicated it was unaware of its discretion under section 12022.53, subdivision (h). That is because, even if the trial court misunderstood its discretion, remand is inappropriate. The trial court expressly stated at sentencing that it would not "give a lower sentence" even if it had greater discretion than the trial court believed it had at the time of sentencing. While our Supreme Court explained in *Fuhrman* that, "where the record *affirmatively* discloses that the trial court *misunderstood* the scope of its discretion, remand to the trial court is required to permit that court to impose sentence with full awareness of its discretion," it also clearly stated that "remand is not required where the trial court's comments indicate that even if it had authority [to exercise discretion it did not believe it had at the time of sentencing], it would decline to do so." (*People v. Fuhrman*, *supra*, 16 Cal.4th at p. 944.) The trial court expressly and very clearly stated that it would have declined to exercise discretion to reduce defendant's sentence. Remand is thus inappropriate. Given the trial court's express statements, defendant cannot demonstrate that his trial counsel was ineffective for failing to object to the sentence.

26

DISPOSITION

The judgment is affirmed.

                                    /s/

                                    ROBIE, Acting P. J.

We concur:

/s/

RENNER, J.

/s/

KRAUSE, J.